FILED

2005 Sep-30  PM 02:25
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | | |
|---|---|---|
| LARRY KINCAID, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CASE NO.: |
| v. | ) | |
| | ) | CV-03-RRA-1740-W |
| STILLMAN COLLEGE, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

The case is presently before the Court on the Defendant's Motion for Summary Judgment.  (Doc. 25). This is a Civil Action filed by the Plaintiff, Larry Kincaid, against the Defendant, Stillman College, on July 8, 2003.  The complaint alleges reverse discrimination based on race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e; age discrimination in violation of both the Alabama and Federal Age Discrimination in Employment Acts; breach of contract; and negligent/wanton retention, training and/or supervision.  For the reasons stated herein, the motion will be . . .

## SUMMARY JUDGMENT STANDARD

In conducting [a summary judgment analysis], [the Court must] view all evidence and factual inferences in the light most favorable to the nonmoving party.  Summary judgment is proper where "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56©). However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment. *Id.*

*Lofton v. Secretary of Dept. of Children and Family Services,* 358 F.3d 804, 809 (11th Cir. 2004).

## FACTS[1]

Plaintiff started working at Stillman College in January 1989 as a staff member, specifically as a co-op coordinator and counselor.  Plaintiff's job was to be available to students for academic counseling. He was responsible for holding on-campus job fairs, contacting job recruiters, and recruiting co-op employers. Plaintiff stated that his "responsibilities of what [he] did never changed, and [he didn't] actually know that they changed [his] title."  At no time during his employment at Stillman College was plaintiff ever demoted.

Kincaid is white, and was over the age of 66 at the end of his employment at Stillman College.  At the time of his termination, his immediate supervisor was Dr. Rodell Lawrence, an African-American, and Dr. Lawrence's supervisor at that time was Dr. Ernest McNealey, an African-American.[2]  During his assignment to the Division of Student Affairs, Kincaid was the only white person employed in that Division.  During his assignment to Corporate Relations, Kincaid was the only white person employed on Dr. Lawrence's staff.

---

[1]The facts are presented, as the court must, in the light most favorable to the non-movant. Where appropriate, but not in all cases, the court will note disputed facts.

[2]The Plaintiff insists that during his employment "his supervisors at Stillman College were African American, and each of his immediate supervisors was, in turn, supervised by Stillman officials who were also African American."  *Opponent's Submission in Response to "Exhibit A" of the Court's Order*, at 25 (citing Opponent's Evidentiary Submissions: Tab 2).  However, even when viewed in the light most favorable to the non-movant, the Plaintiff's citation does not support his contention.

Immediately prior to the non-renewal of Kincaid's employment contract, President McNealey personally transferred Kincaid's job duties back to the Division of Student Affairs and away from the Division of Corporate Relations.  As part of Larry Kincaid's job duties, he was assigned to teach and taught a required freshman course for which Stillman students received two hours academic credit.[3]  Larry Kincaid taught as many or more Stillman College freshman than any other member of the Stillman faculty.  President McNealey personally made the decision to transfer Kincaid's job functions from Corporate Relations back to Student Affairs.

Plaintiff was notified on July 31, 2000, that his contract would not be renewed for the 2000-2001 academic year and that his employment at Stillman College would be terminated.  After Larry Kincaid's termination, his job duties were performed by African American Stillman employees who were younger than Kincaid.

<u>Plaintiff's Supervisors</u>: When plaintiff first began working at Stillman, his immediate supervisor was Donnell Williams, whom he worked under for several years.  In 1994, Jacqueline Currie became Plaintiff's immediate supervisor.  Plaintiff worked under Ms. Currie until he was assigned to Dr. Rodell Lawrence during the 1999-2000 academic school year.

Dr. Ernest McNealey became President of Stillman College in July, 1997.  Dr. McNealey was the direct supervisor of Dr. Rodell Lawrence, who notified Kincaid that his contract would not be renewed.  Dr. McNealey was the direct supervisor of Dr. Sharon Whittaker, who was in charge of the Division of Student Affairs.  Dr. Whittaker informed

---

[3]The Defendant denies any implication from this statement that the plaintiff was a "faculty" as opposed to "staff" member.

Kincaid that he would not be permitted to return to work in the Division of Student Affairs.

Plaintiff's Performance

*Documentation by Plaintiff's Supervisor Jacqueline Curry:*  Jacqueline Currie provided written evaluations of plaintiff's job performance.  In her 1996-1997 evaluation of plaintiff, she gave him a total point rating of 28.5 out of 40.  In the 1996-1997 evaluation, it took at least 28 points to reach the "good" category.  He did not receive an "excellent" rating in any of the categories that academic school year.  Ms. Currie wrote the following comment as part of her evaluation:

> Mr. Kincaid has worked hard this year to increase his visibility among the student body.  This has been a successful effort.  The fall and spring career fairs were successful, even though the November fair occurred during the federal government shutdown.  He has conducted career related workshops for classes and has been an instructor in the GED [General Educational Development] 120 course.  He is the only person who teaches GED during the spring semester; therefore, he is the primary Center staff person involved assisting this group with their academic concerns; he also serves as an academic advisor.
>
> * * *
>
> He [Mr. Kincaid] has worked with students in the development of a number of internship/cooperative education activities and has begun an initiative to assist students with part time employment.  One of his primary concerns has been making faculty knowledgeable of the different types of experiential learning programs that are available to students; he has scheduled meetings to discuss this and has worked with faculty individually to provide services for students.

In the 1997-1998 evaluation, Currie gave plaintiff a total point rating of 22.5 out of 40, which placed him in the "satisfactory" category. Plaintiff did not receive an "excellent" rating in any of the categories in the 1997-1998 evaluation, just like in the 1996-1997 evaluation.

In the 1999 Spring Semester evaluation, Currie rated plaintiff in the 2.25 out of 5

4

range, where one is excellent and five is very poor.  That score of 2.25 put plaintiff barely above the mid-level range of performance.  *Currie Affidavit*, at ¶7.[4]  Currie wrote on plaintiff's 1999 Spring Semester evaluation that, in part, "[a]dditional work is needed to increase [plaintiff's] computer skills and his ability to interact with senior level administrators."  She also wrote:

> Mr. Kincaid worked hard during the year to assure that students participated in a number of career/employment related events.  The increase in the number of recruiters who attended on campus career fair and the increase in the number of students participating in off campus fairs attest to this.  Additional work is needed to increase his computer skills and his ability to interact with senior level administrators.

Currie attached a note to plaintiff's 1999 Spring Semester evaluation in which Dr. Sharon Whittaker, the Vice President for Student Affairs, signed, and in which it was noted that Dr. Whittaker expressed to Currie her concern about plaintiff's insubordination and disrespect for his immediate supervisor, who at that time was Currie.  As the note states, Dr. Whittaker also expressed to Currie her concern about the lack of technology infusion in plaintiff's area of responsibility.  Dr. Whittaker's final assessment, which is memorialized in the note, was that she had no confidence that plaintiff could provide the leadership necessary to take career planning and placement into the new millennium.

*Documentation by Plaintiff's Supervisor Dr. Rodell Lawrence:* While Dr. Rodell Lawrence was plaintiff's supervisor, he provided written evaluations of plaintiff's job performance.  In a Mid-Year Staff Evaluation, Dr. Lawrence noted that plaintiff was doing a poor job in the major duty area of developing a book of resumes of all graduating seniors and in developing, implementing, and evaluating programs, workshops, and career

---

[4]The Plaintiff disputes this statement but provides no evidence to rebut it.

development for students. In that Mid-Year Staff Evaluation, Dr. Lawrence also noted that he disagreed that plaintiff was achieving the appropriate work outputs and he disagreed that plaintiff could be trusted to complete tasks and achieve desired outcomes. Furthermore, he strongly disagreed that plaintiff completed work that maximized work flow.

In Dr. Lawrence's mid-year evaluation of Kincaid's performance in 1999-2000, he strongly agreed that Kincaid was punctual, arrived at work and meetings on time, and reported to work on a consistent basis. He also agreed that Kincaid showed esprit de corps, exhibited cooperativeness and a positive attitude and exhibited sound decision-making in work and in relationships.

In an Annual Staff Evaluation, Dr. Lawrence noted that plaintiff is a hard worker but he needs to become proficient in the use of computers and he needs to provide monthly progress reports in a timely and accurate manner. In an e-mail Dr. Lawrence sent to plaintiff entitled "Performance Issue" and dated June 28, 2000, Dr. Lawrence informed plaintiff that it was critical that he provide him with a Management by Fact Report ("MBF Report") and a progress report and that he was instructed as far back as July 1999 to do so. Dr. Lawrence also informed plaintiff in the June 28, 2000, e-mail that it was imperative that he become efficient in the Gooey Industries Resume Job Placement System software program.

In an e-mail Dr. Lawrence sent to plaintiff on July 19, 2000, he pointed out to him that the progress report he submitted did not resolve the concerns he raised in the June 28, 2000 e-mail because the progress report was eleven (11) days late and did not have an MBF Report attached to it. In the July 19, 2000, e-mail, Dr. Lawrence further instructed plaintiff to submit to him the MBF Report within five (5) working days and to provide to him a

6

demonstration by July 26, 2000, that he was proficient with the Gooey Industries Resume Job Placement System software program. The Plaintiff states that he submitted monthly reports to Dr. Lawrence, but Dr. Lawrence refused to accept them as MBF reports. *Kincaid Declaration*, at ¶ 23. The Plaintiff also states that although he never provided Dr. Lawrence with the demonstration of the Gooey System, he "was prepared to provide him with the demonstration of the Gooey System, but Dr. Lawrence was out of town and unavailable on the date he had chosen for the demonstration. Dr. Lawrence never rescheduled the demonstration." *Id.* at ¶ 24.[5]

 *Non-renewal of Employment Contract*: Dr. Lawrence informed plaintiff in a letter dated July 31, 2000, that plaintiff's contract would not be renewed for the 2000-2001 academic year. It is plaintiff's belief that his performance was "exceptional." As Dr. Lawrence stated in his July 31, 2000, letter to plaintiff: "In the past we have discussed your job performance and you have been given ample opportunity for improvement. To date your performance has not improved and as a result your employment at Stillman College has been terminated."

 Dr. Lawrence testified that he was the sole decisionmaker in plaintiff's contract non-renewal. *Lawrence Affidavit*, at ¶ 12.[6] He and Dr. McNealey did not discuss the termination

---

 [5]The Defendant disputes this. It notes that Dr. Lawrence testified that "Mr. Kincaid failed to comply my July 19, 2000 directive to submit an MBF Report within five (5) working days and to provide to Dr. Lawrence a demonstration by July 26, 2000, that he was proficient with the Gooey Industries Resume Job Placement System software program." *Lawrence Affidavit*, at ¶9.

 [6]While Plaintiff disputes this fact, he merely directs the court generally to "Tabs 1,2,3,4,5,6,7" as evidence in rebuttal. Such a vague citation, in and of itself is not sufficient to withstand Summary Judgment. "Mere general allegations which do not reveal detailed and precise facts will not prevent the award of summary judgment." *Resolution Trust Corp. v.*

prior to Dr. Lawrence arriving at a decision.  *Id.*; *McNealey Affidavit*, at ¶ 7.[7]  The decision

did not have to be cleared through Dr. McNealey.  *McNealey Affidavit*, at ¶ 6.[8]  Jacqueline

Currie "played no role whatsoever in the decision not to renew [Plaintiff's] contract."  *Currie*

*Affidavit*, at ¶9.[9]

Plaintiff's termination became effective August 31, 2000.  Plaintiff filed an internal

grievance with regard to his contract non-renewal.  Stillman College responded in writing that

"[t]he Staff Grievance Committee has reviewed your September 25, 2000, correspondence

alleging 'Wrongful Termination' and the supporting documentation. The Committee has

determined that the claim is without merit, and, therefore, the relief in your appeal is not

granted."

Comparators: Other employees at Stillman College who Dr. Lawrence supervised were

required to submit MBF Reports and to demonstrate proficiency with the Gooey Industries

---

*Dunmar Corp.*, 43 F.3d 587, 592 (11th Cir. 1989).  Furthermore, Fed. R. Civ. P. 56©) "saddles
the non-movant with the duty to 'designate' the specific facts in the record" supporting his claim.
*Jones v. Sheehan, Young & Culp, P.C.*, 82 F.3d 1334, 1338 (5th Cir. 1996).  "Rule 56 . . . does not
impose upon the district court a duty to survey the entire record in search of evidence to support a
non-movant's opposition."  *Id.; see also Resolution Trust*, 43 F.3d at 599 ("There is no burden on
the district court to distill every potential argument that could be made based upon the materials
before it on summary judgment.").  Even if the citations were appropriate, there is nothing
contained in these items, not struck, which dispute this statement in any way.  Some of the
evidence has been struck, but other declarations *in their original form* simply do not support the
Plaintiff's contention.

[7]This too is disputed by the Plaintiff, with no sound evidentiary basis.

[8]This too is disputed by the Plaintiff, with no sound evidentiary basis.

[9]This too is disputed by the Plaintiff, with no sound evidentiary basis.

Resume Job Placement System software program.[10]

No other Stillman College employee who Dr. Lawrence supervised failed to submit an MBF Report as requested or failed to demonstrate proficiency with the Gooey Industries Resume Job Placement System software program. *Lawrence Affidavit*, at ¶ 14.[11]

<u>Statements by Dr. MeNealey</u>

*Statement by Dr. McNealey in Faculty/Staff Meetings*: Plaintiff alleges that he was told by another Stillman College employee that Dr. McNealey said in a faculty/staff meeting that he wanted "faculty more the age, and I forget how he put that, and appearance of the students or something like that. . . . Closer to the age of the students and that they appear, in other words, that they needed fewer white faculty and more minority faculty." In his deposition, plaintiff testified that Dr. McNealey did not make the alleged statement "that way," but that "that's the way" plaintiff and a couple of his co-workers talked about it. While plaintiff claims to have been present at the faculty meeting, he "can't remember precisely hearing" the alleged statement. Plaintiff has no recollection when the alleged statement was made. Plaintiff claims that other Stillman College employees allegedly heard the statement and allegedly told him about it.

*Statement by Dr. McNealey in an SGA Meeting*: Plaintiff alleges that a biology professor, a Dr. Branton, told him that some of her students told her that Dr. McNealey said

---

[10]The Plaintiff disputes that all other employees "demonstrated proficiency in the Gooey system."

[11]The Plaintiff states that he is "unaware of whether other employees submitted their reports." The Plaintiff disputes that he failed to show proficiency or that other employees showed proficiency but provides no evidence to rebut Dr. Lawrence's statement.

in a Student Government Association meeting that the "faculty would look more like the students in terms of race and age."

Dr. McNealey never said anything personally to the plaintiff that would indicate any bias with regard to race or age.

Statement by an Unknown Source at a Stillman College Football Game: According to the plaintiff, Booker Crawford, a former Stillman College employee, told him that during the Miles College v. Stillman College 2002 football game, "several of Dr. McNealey's higher echelon guys were talking, and up walked to the end zone Dr. [Rodell] Lawrence who said how was that situation with – that suit or something with Larry Kincaid coming." Crawford allegedly told plaintiff that someone in that group allegedly said "[w]hy, that short, white, little m****r f****r" will never get a dime from Stillman College." Plaintiff was not present when that alleged statement was made and does not know who specifically allegedly made the statement. This alleged statement was made after plaintiff's termination.

*Statement by Dr. Lawrence That Does Not Refer To Race or Age*: Plaintiff alleges that on one occasion Dr. Lawrence "more or less" told him that Dr. McNealey "wanted a complete turnover of faculty." Dr. Lawrence did not specifically mention race or age in that alleged conversation:

Q.     But race wasn't mentioned specifically?

A.     No.

Q.     What about age, was it mentioned as such?

A.     I think something to the extent that the whole – you know, we had many old faculty members or staff members.

10

Q.    Okay. Tell me one.

A.    But I don't remember the exact words.

Q.    Did Dr. Lawrence say something about this? I'm curious. What was said about old faculty members?

A.    I don't know that it was put in that manner except that he needed to turn over everybody.

*Kincaid Deposition*, at 124-125.

<u>Other Statements and Incidents</u>: The Plaintiff has produced the following declaration testimony:

7.    During one meeting of the Faculty-Staff Assembly in the spring of 1999, Dr. McNealy stated that one of his goals was to produce a faculty that would be closer in age to the student body than the current faculty.

* * *

9.    During a meeting of the Academic Coordinators in the fall of 1998, Dr. Mackin introduced a document entitled "Paradigms of Teaching and Assessment." . . . For faculty departments, such as mine, one of the paradigms required the submission of three names as finalist for each position, and required at least two of these nominees to be African-American. Additionally, academic departments were expected to implement policies over and above the hiring policy to increase the percentage of African-American faculty.

*Lawson Declaration*, at ¶ 7, 9.

5.    President McNealey announced to the Faculty-Staff Assembly that Stillman's employment policy would be changed to insure that those employed to teach Stillman students more closely reflected the Stillman study (sic) body in their race and their age.

* * *

7.    Shortly after President McNealy announced Stillman's new policy a formal hiring policy change was announced by Dr. James Mackin, whom Dr. McNealey had recently hired to be Stillman Colleges'

11

Academic Vice President.

8.  Vice President Mackin instructed that, from that point on, filling any vacancy would require the submission of three final candidates, of whom two must be African American.

*Millar Declaration*, at ¶ 5, 7-8.

7.  At one of the meetings when Dr. McNealey addressed the college assembly, he said that he believed that more of the faculty of the college should be younger African-Americans.  On one occasion when making this observation Dr. McNealey physically brushed himself on the leg and said that Stillman needed more faculty who, ". . . look like me but are younger."

8.  On another occasion, Dr. Charles Mackin, who was hired by Dr. McNealey as Vice President for Academic Affairs at Stillman College, addressed the college assembly and said that he [ ] believed[12] that the fact that only 45% of the faculty was African American was "deplorable."  He imposed a regulation for new hires which required the submission of the names of three candidates for each position, two of whom must be African American.  I observed that this new policy was implemented in the search for a new sociology faculty member.

\* \* \*

10.  In a public discussion forum at Stillman College I observed Dr. Lawrence respond to a visiting speaker (who was talking on the subject of race relations) and say that there was, ". . . no way that we [African Americans'] were going to lose this battle.  We will arm ourselves and win the battle.

*Mills Declaration*, at ¶ 7-8, 10.

27.  President McNealey announced to the assembled faculty and staff a new employment policy at Stillman designed to insure that those employees teaching Stillman students were more representative in

_____

[12]The Court erroneously struck the word "believed" in a previous motion to strike.  It is properly considered as part of the declaration in ruling on the present motion for summary judgment.  In that same ruling, the Court erroneously stated that paragraph 8 of the Mills Affidavit was struck, when paragraph 9 was the actual paragraph that was to be struck.  A fair reading of the Order makes it clear that the original statement by the Court was a typo.  Paragraph 8 will be considered as amended herein, while paragraph 9 will not.

their race and age of the Stillman student body which was almost
exclusively African American.

28.     President McNealey hired Dr. James Mackin as Academic Vice
        President. Dr. Mackin announced a new hiring policy which required
        that before anyone could be hired in a position to teach at Stillman,
        three finalists had to be selected and at least two of those finalists had
        to be African American.

                                      * * *

37.     President McNealey transferred my job back to Student Affairs in spite
        of Dr. Whittaker's avowed refusal to permit me to work under her.

*Kincaid Declaration*, at ¶ 27-28, 37.

        The Brenda Jennings Document: Plaintiff alleges that Brenda Jennings, a

secretary in the Student Development Department, gave him a document that stated

the following:

        To Whom It May Concern:

        During a discussion with Jacqueline Currie in the Spring of 2000, Larry Kincaid was
        being discussed as being transferred to the area of Corporate Affairs so that Dr.
        Lawrence could terminate his employment. Ms. Currie discussed it more than once.
        She was very determined she and Dr. Whittaker to terminated (sic) Mr. Kincaid.
        This process that was discussed between Mr. (sic) Currie, Dr. Whittaker and Dr.
        Lawrence was soon done and Mr. Kincaid was terminated. This had been planned for
        some time.

        Pangie Wilson's Allegation of Unfair Termination: A former Stillman College

employee named Pangie Wilson wrote an unsworn "To Whom It May Concern" letter that

stated that she was terminated unfairly and that "Dr. McNealey began some type of vendetta

and started dismissing a lot of employees with no legitimate reason." Wilson says nothing in

the letter that her termination had anything to do with race or age. In fact, Wilson is African-

American, not one of the white staff or faculty members that plaintiff alleges in his Complaint

were the subject of race discrimination. In the letter, Wilson says that it was Dr. McNealey

13

that "wanted me gone."  Wilson makes no reference whatsoever to Dr. Rodell Lawrence in her letter.

Plaintiff claims that Wilson was afforded a grievance hearing with regard to her termination and he was not with regard to his.  Wilson's alleged grievance hearing did not prevent her from being terminated from Stillman College. Wilson remains terminated from Stillman College.

The Bertha H. Herndon Letter: Bertha Herndon is the "retired Director of Health Services at Stillman College" who worked "under the Student Affairs Office (Dr. Sharon Whittaker) and . . . under the Student Development Center (Ms. Jacqueline Currie)." Herndon wrote in an unsworn "Dear Sir" letter that "I feel basically that [plaintiff] was not treated right, that there was open hostility towards him even though he performed well in his work, and that he experienced discrimination by both his age as well as his race."  She further wrote that (a) "[o]verall, the attitude in the Student Development Center was not good, because they did not like older people"; (b) "I saw during staff meetings many times, the efforts to embarrass him because he was white"; and ©) "I feel that the over-all treatment of Mr. Kincaid had to do with his being white and older than the rest of the staff in the Student Development Center."  Herndon's "Dear Sir" letter makes no reference whatsoever to Dr. Rodell Lawrence.

Plaintiff's Employment Contract: Plaintiff had an employment contract for the 1999-2000 academic school year.  In his Complaint, plaintiff alleges that--

> Stillman College terminated Mr. Kincaid on the pretext of unsatisfactory performance. However, the true reason for the nonrenewal of the contract and termination was that Mr. Kincaid was a white, 66 year old employee. Because Mr.

14

> Kincaid was not actually fired for unsatisfactory performance or prolonged absence, the Defendant breached the contract of employment with the plaintiff.

The Defendant contends that

> Plaintiff's employment contract for the 1999-2000 academic school year was no different than the employment contracts he signed for the 1997-1998 and 1998-1999 school years. *Kincaid Deposition*, at 61-62. Like plaintiff's 1997-1998 and 1998-1999 contracts, Plaintiff's contract for the 1999-2000 academic school year stated that continued employment was contingent upon performance evaluation. *Id.* at 61-63. Dr. Lawrence concluded that plaintiff's job performance did not warrant contract renewal because plaintiff failed to submit an MBF Report as requested and failed to demonstrate proficiency with the Gooey Industries Resume Job Placement System software program.

*Lawrence Affidavit*, at ¶¶9-11.

## NEGLIGENCE CLAIMS

Plaintiff brings Alabama state law tort claims of negligent/wanton retention, training and/or supervision. Specifically, he alleges that it was Dr. McNealey whom Stillman College negligently and/or wantonly failed to terminate, train, or supervise. The First Amended Complaint does not allege that Stillman College negligently and/or wantonly failed to terminate, train, or supervise anyone else. The First Amended Complaint alleges that the Stillman College's alleged failure to terminate, train, or supervise Dr. McNealey resulted in "harassment and/or discrimination" by Dr. McNealey. In his deposition, plaintiff testified as follows:

Q.   What about who supervises the president, do you have any –

A.   It's the trustees supposedly.

Q.   Okay. Did you have any complaint about the way they supervised McNealey? Do you know what they told McNealey to do?

15

A.      I have no idea.

*Kincaid Deposition*, at 130.

## EEOC INVESTIGATION

In its Determination the EEOC found that Stillman College had: "Discriminated against Charging Party [Kincaid] with respect to subjecting him to a hostile work environment and non-renewal of his employment contract because of his race, White and age over 40, in violation of Title VII of the Civil Rights Act of 1964, as amended and the Age Discrimination in Employment Act of 1967."  In its Determination the EEOC found that Stillman College had also:  "…discriminated against White employees, who were over the age of forty (40), in violation of Title VII of the Civil Rights Act of 1964, as amended and the Age Discrimination in Employment Act of 1967."

## DISCUSSION

Discrimination: In order to make out a prima facie case of discrimination under the *McDonnell Douglas* framework, the plaintiff must show that he is a member of a protected class, that he suffered an adverse employment action, that he was qualified for his job, and that he was replaced by someone in another class. If the plaintiff succeeds in doing this, it becomes incumbent upon the defendant to articulate a legitimate, non-discriminatory reason or reasons for the action taken. If the defendant does so, the plaintiff has the burden of pointing to evidence sufficient to create an issue as to whether each and every reason given by the defendant was mere pretext for the real reason of discrimination. *Combs v.*

16

*Meadowcraft, Inc.*, 106 F.3d 1519 (11th Cir. 1997).

In this case, the plaintiff claims not only circumstantial evidence of discrimination, which triggers the *McDonnell Douglas* scheme, but contends that this case contains direct evidence of discrimination.  It matters whether evidence of discrimination is direct or indirect, because the burden on the defendant is greater when there is direct evidence of discrimination. This is explained in *Lee v. Russell County Board of Education*, 684 F.2d 769, (11th cir. 1982):

> The *McDonnell Douglas* analysis is only one means of proving a case of discrimination, however. It is not the exclusive means. *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 576, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978); *International Brotherhood of Teamsters v. U.S.*, 431 U.S. 324, 357- 58, 97 S.Ct. 1843, 1865-1866, 52 L.Ed.2d 396 (1977); *Lee v. Conecuh County Board of Education*, supra, 634 F.2d at 962; *McCuen v. Home Insurance Co.*, 633 F.2d 1150, 1151-52 (5th Cir. 1981); *McCorstin v. U.S. Steel Corp.*, 621 F.2d 749, 753-54 (5th Cir. 1980). The *McDonnell Douglas* analysis is "(i)ntended progressively to sharpen inquiry into the elusive factual question of intentional discrimination," 774 *Burdine*, 450 U.S. at 254 n.8, 101 S.Ct. 1089 at 1094 n.8, where the plaintiff's case is made out with circumstantial evidence supporting the inference of discrimination, *id*. at 253, 101 S.Ct. at 1093. Where a case of discrimination is made out by direct evidence, reliance on the four-part test developed for circumstantial evidence is obviously unnecessary. *See, e.g., Ramirez v. Sloss*, 615 F.2d 163, 168 & n.9 (5th Cir. 1980); *Crawford v. Western Electric Co., Inc.*, 614 F.2d 1300, 1315 (5th Cir. 1980).
>
> Moreover, where a case for discrimination is proved by direct evidence it is incorrect to rely on a *McDonnell Douglas* form of rebuttal. Under the *McDonnell Douglas* test plaintiff establishes a prima facie case when the trier of fact believes the four circumstances outlined above which give rise to an inference of discrimination. <u>Where the evidence for a prima facie case consists, as it does here, of direct testimony that defendants acted with a discriminatory motivation, if the trier of fact believes the prima facie evidence the ultimate issue of discrimination is proved;</u> no inference is required. Defendant cannot rebut this type of showing of discrimination simply by articulating or producing evidence of legitimate, nondiscriminatory reasons. [FN6] Once an unconstitutional motive is proved to have been a significant or substantial factor in an employment decision, defendant can rebut only by proving by a preponderance[FN7] of the evidence that the same decision would have been reached even absent the presence of that factor. *Mt. Healthy City School District v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). *See, e.g., Avery v. Homewood City Board of Education*, 674 F.2d 337 (5th Cir. 1982) (Unit B).

FN6. To allow rebuttal of a proved case of discrimination simply by articulation of a plausible nondiscriminatory reason would be to "stick (plaintiff) on the four prongs of *McDonnell Douglas* when he has already shown intentional discrimination by direct evidence." *Ramirez*, supra, 615 F.2d at 169 n.10 (5th Cir. 1980).

FN7. Note that where there is a past history of discrimination, possibly the burden is one of clear and convincing evidence. See note 5, supra.

To summarize, the often used *McDonnell Douglas* test is but one way to prove discrimination. It is designed to focus the inquiry where circumstantial evidence is relied on. Where strong, direct evidence is presented, reliance on *McDonnell Douglas* as the exclusive means of proving the case and as the proper form of rebuttal is incorrect. When a significant unconstitutional motive is ultimately proved, by either circumstantial or direct evidence, the defendants' only form of rebuttal is under *Mt. Healthy*.

*Id.* at 773-774 (emphasis added).

The Eleventh Circuit has discussed the difference between direct and indirect or circumstantial evidence of discrimination.

This Court defines direct evidence of discrimination as "evidence which reflects 'a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee.' " *Damon*, 196 F.3d at 1358 (quoting *Carter v. Three Springs Residential Treatment,* 132 F.3d 635, 641 (11th Cir. 1998)). Direct evidence is "evidence, that, if believed, proves [the] existence of [a] fact without inference or presumption." *Burrell v. Bd. of Trs. of Ga. Military Coll.,* 125 F.3d 1390, 1393 (11th Cir. 1997). As our precedent illustrates, "only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of" some impermissible factor constitute direct evidence of discrimination. *Rojas v. Florida,* 285 F.3d 1339, 1342 n. 2 (11th Cir. 2002) (quoting *Schoenfeld,* 168 F.3d at 1266) (citations and quotations omitted); *see Carter v. City of Miami,* 870 F.2d 578, 582 (11th Cir. 1989). If the alleged statement suggests, but does not prove, a discriminatory motive, then it is circumstantial evidence. *See Burrell,* 125 F.3d at 1393. Ptakowski's alleged statements are not direct evidence of discrimination. The comment that she was "the obvious choice" does not evidence bias or the intent to discriminate on the basis of sex. It is neutral.

Ptakowski's alleged comment that "even though women aren't typically in that type of position we'll see what happens when we throw your name out there to corporate" does not directly correlate with an intent to discriminate on the basis of sex. *See Damon,* 196 F.3d at 1358. <u>The statement allows an inference of discrimination, but a factfinder could also infer reasonably that the statement was nothing more than an observation of a fact.</u> The statement, therefore, does not prove discrimination "without inference or presumption." *Burrell,* 125 F.3d at 1393. In

18

similar instances, this Court has refused to classify such comments as direct evidence of discrimination. In *Damon,* an age discrimination case, the decisionmaker's comment that "the company needed ... young men ... to be promoted" did not constitute direct evidence of discrimination. 186 F.3d at 1359. In *Burrell,* a sex discrimination case, evidence that the decisionmaker told the plaintiff that "he wanted to hire a man for the position because too many women filled First Federal's officer positions" was not direct evidence that she was terminated later because of her sex. 125 F.3d at 1393-94. In contrast, in *Caban-Wheeler v. Elsea,* we held that a statement by the decisionmaker that he wanted to have a black person do a white employee's job was direct evidence that the white employee was terminated for racially discriminatory reasons. 71 F.3d 837, 842-43 (11th Cir. 1996). We also found direct evidence of discrimination in *Haynes v. W.C. Caye & Co., Inc.*, where the decisionmaker stated that women were simply not tough enough to do the job from which the plaintiff had been removed. 52 F.3d 928, 930 (11th Cir. 1995). The district court, therefore, correctly held that Wilson did not present direct evidence of discrimination.

*Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079, 1086-87 (11th Cir. 2004) (underlining added).

For additional clarification, in *Damon v. Fleming Supermarkets of Florida, Inc*., 196 F.3d 1354 (11th Cir. 1999), it was stated by the decisiion-maker, immediately after the termination of Kanafani, one of the plaintiffs, that "what the company needed was aggressive young men like [the person  promoted over the plaintiff] to be promoted."  The court held:

> While the statement was made right after Kanafani's termination, and it was made by Soto, the decision-maker, to Kanafani's younger replacement, the comment does not amount to direct evidence of discrimination. Though probative circumstantial evidence of Soto's state of mind, the comment still requires us to infer that Soto's interest in promoting young men motivated his decision to terminate Kanafani. In similar instances, our court has refused to classify such comments as direct evidence of discrimination. *See, e.g., Beaver v. Rayonier Inc*., 188 F.3d 1279, 1285-86 (11th Cir.1999) (finding that decision-maker's comment that he wanted to attract "younger, engineer-type employees or supervisors" in reduction-in-force case did not rise to level of direct evidence of discrimination); *Burrell v. Board of Trustees of Georgia Military College*, 125 F.3d 1390, 1393-94 (11th Cir.1997) (holding that evidence which suggests, but does not prove, a discriminatory motive, is circumstantial evidence by definition). We therefore conclude that the district court correctly found no direct evidence of age discrimination.

*Id*. at 1359. In *Burrell v. Board of Trustees of Georgia Military College*,

> Plaintiff testified that when she asked Baggarly--about a year before she was fired--to give her the executive vice president job, he responded that he wanted to hire

19

a man for the position because too many women filled First Federal's officer positions. She says the statement constitutes direct evidence of gender discrimination. Assuming for the sake of argument that Baggarly did, in fact, make the statement, it is not direct evidence of gender discrimination in Plaintiff's *termination*.

125 F.3d at 1393.

After careful comparison of the statements in this case[13] with the statements in the cases quoted above, it is concluded that none of our statements constitutes direct evidence of discrimination. Applying the *McDonnell Douglas* test, it is determined that the plaintiff has presented a prima facie case of discrimination, and that the defendant has articulated legitimate, non-discriminatory reasons for firing the plaintiff. The harder question is whether there is sufficient evidence of pretext to allow the discrimination claims to proceed.

The policy of President McNealy and his remarks applied to faculty members or teachers. Leaving aside the question whether the plaintiff was a member of the faculty or a teacher, the "policy" applied to hiring and not firing.  Moreover, it cannot be argued that the Plaintiff was fired so that a younger, black person could be hired, because "after Larry Kincaid's termination, her job duties were performed by African American Stillman <u>employees</u> who were younger than Kincaid."  (Emphasis added.)  Additionally, even if somehow McNealy's policy was meant to apply to the Plaintiff,  it was Lawrence who made the decision to terminate the Plaintiff, and there is no evidence that Lawrence acted in accordance with what he thought might be the discriminatory wishes of President McNealy. In fact, there is no definitive evidence that Lawrence was even aware of them. Neither is there any evidence that Lawrence harbored any racial prejudice. Lawrence's statement that there was "no way

---

[13] Some of the statements are obviously inadmissible hearsay, even though they were not objected to by the defendant.

that we [African Americans] were going to lose this battle" was made in response to a visiting speaker who spoke on the question of race relations. It cannot be found that such statement expressed a desire to treat white persons unfairly. After careful consideration, it is concluded that there is simply insufficient evidence to support a finding that the legitimate, non-discriminatory reasons given by the defendant for discharging the plaintiff were pretexts for race or age discrimination.

<u>Breach of Contract Claim</u>:  The Plaintiff claims that the Defendant breached its contract with him because it fired him for discriminatory reasons.  Because Plaintiff's discrimination claims are without merit, this claim too fails.

<u>Negligent/Wanton Retention, Training and/or Supervision Claim</u>: The Plaintiff specifically alleges that it was Dr. McNealey who Stillman College negligently and/or wantonly failed to terminate, train, or supervise, and that the alleged negligence resulted in "harassment and/or discrimination."  "In order to establish a claim against an employer for negligent supervision, training, and/or retention, the plaintiff must establish that the allegedly incompetent employee committed a common-law, Alabama tort." *Thrasher v. Ivan Leonard Chevrolet, Inc.*, 195 F. Supp. 2d 1314, 1321 (N.D. Ala. 2002) citing *Stevenson v. Precision Standard, Inc.*, 762 So. 2d 820, 824 (Ala. 1999).

Alabama does not recognize a common law tort for race discrimination or hostile work environment in employment.  Similarly, there is no Alabama common-law tort prohibiting age discrimination.  Accordingly, no state law action can be maintained.  Even if such an action did exist, it would not be actionable here as there is no evidence that Dr. McNealy made any decision not to renew the Plaintiff's contract.

DECISION

For the reasons set out in this memorandum opinion, the defendant's motion for summary judgment is due to be granted. An appropriate order will be entered.

DONE this 30th day of September, 2005.


ROBERT R. ARMSTRONG, JR.
UNITED STATES MAGISTRATE JUDGE